Thomas R. Krider, AK Bar No. 2201002
Drew F. Duggan (admitted *pro hac vice*)
Robin L. Kovis (admitted *pro hac vice*)
SMITH CURRIE OLES LLP
600 University Street, Suite 1800
Seattle, WA 98101
Phone: 206.623.3427
Fax: 206.682.6234
Email: trkrider@smithcurrie.com
Email: dfduggan@smithcurrie.com
Email: rkovis@smithcurrie.com

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| PLATYPUS MARINE, INC., a Washington Corporation,<br><br>Plaintiff,<br><br>v.<br><br>GLACIER GUIDES, INC., an Alaska Corporation, *in personam*, ALASKA LEGACY, LLC, *in personam*, M/Y ALASKAN GRANDEUR, O.N. 1121333, her engines, tackles, hull, machinery, and gear, *in rem*,<br><br>Defendants. | Case No. 1:22-cv-00006-APG<br><br>**DEFENDANT GLACIER GUIDES, INC.'S TRIAL BRIEF** |

## I. INTRODUCTION

This dispute arises out of a yacht maintenance and repair job gone wrong. Defendant Glacier Guides, Inc. ("Glacier Guides") owns a charter-based hunting and fishing guide service operating off of a 78' yacht, the vessel M/Y ALASKAN GRANDEUR, O.N. 1121333 (the "ALASKAN GRANDEUR" or the "Vessel"), which

serves as a floating hotel/transport for Glacier Guides' clients. Glacier Guides contracted to have the Vessel serviced and repaired (the "Project") by plaintiff shipyard Platypus Marine, Inc. ("PMI" or "Platypus"). At bottom, PMI's performance on the Project was wholly inadequate. From the outset, PMI failed to implement reasonable, industry standard control measures like developing and updating feasible work schedules, subcontractor and supplier coordination, work sequencing and shipyard resource allocations, and providing appropriate, contractually required levels of documentation. Much of the inadequate scheduling, sequencing, and shipyard resource allocation is directly attributable to PMI prioritizing lucrative Coast Guard repair jobs over its work on the Vessel. These failures led to entirely foreseeable results – the job ran drastically over schedule, exceeded the estimated budget by nearly double the original quote, and PMI redelivered the Vessel with a host of defective work and incomplete work.

Attempting to recover its losses due to these self-imposed failures, PMI presented Glacier Guides with a final invoice balance of $251,580.76, an increase of over one thousand percent (1000%) compared to the average bill throughout the life of the Project.[1] Glacier Guides vehemently disputed this unconscionable final invoice. PMI, however, refused to release the Vessel until Glacier Guides paid this final invoice in full– knowing that their refusal to return the Vessel would cause Glacier Guides to default on their pre-scheduled charter season, and face substantial liability.

Faced with the untenable situation of either paying PMI's illegitimate charges or defaulting on its own charter obligations, Glacier Guides' principals made the only choice they felt was available to secure their Vessel and be under way – they wrote one check for the agreed upon charges, and another check for the disputed charges ("Check

---

[1] To be exact, the final invoice presented by PMI was a 1340.74% increase compared to the average bill amount of $17,461.92 between December 21, 2021 and March 22, 2022.

757"). Once the Vessel was back in Glacier Guides' possession they cancelled Check 757. These facts are generally agreed upon by the parties.

## II. FACTUAL BACKGROUND AND CONTROLLING CONTRACTUAL PROVISIONS

On or about December 3, 2021, Glacier Guides and PMI entered into the contract that is central to the dispute before the Court (consisting of a Haul-Out/Launch Agreement & Yard Policies ("Haul-Out Agreement"), Vessel Repair Terms and Conditions ("Terms and Conditions"), and an Authorization for Work Performed ("AWP Agreement") – collectively the "Contract"). Paramount to this agreement was the mutual understanding that the Project would be completed by mid-February 2022, leaving sufficient time for corrections of potential defects and for the Vessel to return to Alaska prior to the start of the spring bear hunting season.

Upon delivery of the Vessel, PMI and Glacier Guides established a "Work Plan" consisting of 13 customer signed work orders (the "Project Scope"). Each element of the Project Scope was established as either a fixed-bid cost, a time and materials item, or warranty work to correct PMI's prior non-conforming repairs. All told, it was estimated that the Project would cost approximately $277,348.00 and that the Vessel would be redelivered to Glacier Guides by mid-February.

Key provisions in the Contract that apply in this action are as follows:

> 1. BASIC AGREEMENT: Platypus Marine, Inc. agrees to undertake the work on the Vessel as requested by Customer in the Work Description and shall, unless and only to the extent otherwise agreed in the Work Description, provide the facility and all labor, materials, tools, and equipment necessary to perform such work. Platypus' undertaking is limited to the work identified on the Work Description but shall include necessary removals and replacements for access as well as any changes to the work as requested by Customer and agreed by Platypus pursuant to Section 4, below.

Terms and Conditions, Paragraph 1.

//

//

> B. Payment. Unless otherwise agreed in the Work Plan, Platypus shall invoice Customer every week, with payment due fifteen (15) days from date of invoice and any remaining balance shall become due at redelivery of the Vessel to Customer. All payments shall be made to Platypus in US dollars without deduction or offset. Amounts due but not paid shall accrue interest at the rate of one percent (1%) per month from date due until paid in full. Notwithstanding anything to the contrary, all payments shall be made to Platypus before the Vessel is launched from the facility. A three percent (3%) convenience fee will be added to invoices paid with credit cards. Standard methods of payment are checks and bank transfers/wires.

*Id.*, Paragraph 2 B.

> 3. FORCE MAJEURE: Platypus reserves the right to increase price or cancel the contract if its costs increase due to strikes, labor disturbances, unforeseen conditions discovered during the course of repair, unavailability or late delivery of materials, equipment or supplies, inability to obtain labor, materials, equipment or supplies, fire, explosion, earthquake, flood or adverse weather conditions, or any other circumstance beyond its direct control.
>
> 4. ADDITIONAL WORK: Customer may at any time request additions to, deletions from, adjustments of, or other changes to the work description as set forth in the Work Description. Although these changes may be oral, Customer shall execute a written change order or otherwise agree by e-mail if requested by Platypus. All such change orders whether written or oral shall be performed on a time and materials basis as set forth above and shall be subject to the terms and conditions of this agreement.

*Id.*, Paragraphs 3-4.

> **HAUL-OUT / LAUNCH AGREEMENT**
>
> Platypus Marine, Inc. agrees to launch the ___Ak Grandeur___ within twenty-four (24) hours of the request of the vessel owner, ___Zach Decker___, and/or the authorized owner's representative, ___Hish Decker___, so long as all contracted obligations are fulfilled and monies due are paid in full and funds cleared.

Haul-Out Agreement, at pg. 1.

> • All changes, including clarification, to the pre-defined scope of work must be presented in writing to PMI's management for pricing and scheduling change orders prior to commencement of work.

*Id.*, at pg. 2.

> 11. REDELIVERY: Platypus shall tender the Vessel for redelivery after Platypus' work has been completed. Customer shall inspect the Vessel at such time and/or at any required test and trials to determine whether the work of Platypus conforms to that in the work description is as requested, or whether it is found to be non-conforming, defective, or deficient. Customer must inform Platypus in writing of any non-conformity, defect, or deficiency at the time of such inspection, and shall provide Platypus a reasonable opportunity to correct the same. Upon completion of such inspection and acceptance of any such corrections by Customer, the Vessel shall be redelivered to Customer.

Terms and Conditions, Paragraph 11.

> 12. **WARRANTY, LIMITATION OF LIABILITY AND WARRANTY CLAIMS:** <u>A. Warranty.</u> Platypus warrants that its work shall precisely conform to that identified as the responsibility of Platypus in the Description and any
>
> Platypus Marine, Inc.
> T: 360.417.0709 | F: 360. 417.0729
> 518 Marine Drive, Port Angeles WA 98363
> www.platypusmarine.com



Updated May 04, 2021

> amendment, that the same shall be free from defects and deficiencies, and that its workmanship shall otherwise be of good commercial quality for a period of one (1) year after the date and time of redelivery of the Vessel to Customer (referred to as the warranty period), subject to the following:
> (1). All non-conformities, defects, and deficiencies must be discovered and notified in writing to Platypus within the warranty period identified above.
> (2). Platypus shall have reasonable opportunity to inspect the Vessel and claimed non-conformity, defect, and/ordeficiency in its condition as first discovered and before any repair has commenced, except in emergency circumstances.
> (3). Platypus shall have reasonable opportunity to repair/replace/cure the same. In such an event, Customer shall deliver the Vessel and/or defective work or materials, etc. to Platypus at Customer's expense, and Platypus shall repair/replace/cure the same at its expense, time being of the essence. In the event of emergency circumstances requiring that the repair/replacement occur elsewhere and/or be performed by others, Platypus shall not be responsible for any costs exceeding those which would have been charged by Platypus had it performed the work itselfat its facility.
> (4) Platypus does not warrant equipment, parts, coatings, and other materials that are provided with the work. All such equipment, parts, coatings, and other materials will fall under the warranty provided by the respective manufacturer.
> (5) All paint finishes are guaranteed one (1) year for gloss retention and adhesion. There will be no guaranteeagainst blistering of coatings on wood that is not dry.
> (6) All other warranties whether express or implied are specifically disclaimed.
> (7) Platypus' maximum liability pursuant to the warranty set forth herein shall not exceed, in the aggregate, thelesser sum of $100,000 or the value of the work performed by Platypus under this Agreement.
> (8) Customer's sole remedy for damage to the vessel, whether sounding in contract or tort, shall be limited to thiswarranty.
> (9) Platypus' maximum liability to Customer for all causes of action, sounding in contract or tort, is $100,000, even ifthe damage was caused by the sole negligence or fault of Platypus.
>
> <u>B. Waivers.</u> Notwithstanding the foregoing, in no event shall Platypus be liable with respect to and Customerspecifically waives the following:
> (1) any defect in workmanship or materials that was open and evident and/or could have been discovered during thecourse of work or at the time of redelivery; and
> (2) any equipment, parts, materials, or workmanship, other than Platypus warranting its own workmanshipassociated with the installation of the same, as applicable.

*Id.*, Paragraphs 12 A-B.

//

//

> C. Exclusivity of Remedy. The foregoing shall be Customer's sole and exclusive remedy against Platypus; in no event shall Platypus be liable to Customer for work performed on any other basis or under any other theory, including, but not limited to, actions based on negligence or strict liability, and **Customer hereby waives any and all other warranties, express and implied, respecting the work, including without limitation all warranties of merchantability, fitness/suitability for any particular purpose/use and workmanlike service.**

*Id.*, Paragraph 12 C.

> As owner of the Vessel **Alaskan Grandeur** (name of vessel), I agree that **Zach or Alisha Decker** (name of person), the Vessel's representative, agent or captain has the authority to act on behalf of the Vessel and its owner.
>
> Also, the person named below will authorize all work performed, pay invoices as scheduled and agree to any additional work that commences.
>
> **Zach & Alisha Decker** (name of person authorized; e.g., owner, captain, crew worker).

AWP Agreement.

Succinctly put, the Contract limited PMI's work to the pre-defined Project Scope. Glacier Guides could, however, request changes to the Project Scope either orally or in writing. Changes would then be memorialized through a written change order or e-mail <u>and presented to PMI management for pricing and scheduling change orders</u>. PMI warranted that its work would precisely conform to the Project Scope, including subsequent documented change orders, and that <u>the work would be free from defects and deficiencies</u>. In return, Glacier Guides would promptly pay for PMI's authorized work.

If PMI had performed in accordance with the Contract, there would likely be no dispute before the Court. In reality, however, PMI failed to price and schedule authorized changes, unilaterally expanded the Project Scope without authorization, and prioritized other shipyard projects to the detriment of Glacier Guides. Because PMI did not follow its own contractual requirements, the Project was unjustifiably delayed, excessively over budget, and there were numerous defects and deficiencies

in the work. Amongst other things, PMI's failures deprived Glacier Guides of the reasonable opportunity to inspect the Vessel upon redelivery and justify the cancellation of Check 757.

### III. SUMMARY OF ISSUES, APPLICABLE LAW, AND PRIOR RULINGS

Here, the ultimate issues before the Court are (1) whether PMI breached the Contract and (2) whether Glacier Guides was justified in cancelling Check 757. The evidence at trial will show that both issues should be answered in the affirmative. Additionally, motions *in limine* are currently before the Court.

The Court has previously held, and the parties do not dispute, that the Contract is governed by federal maritime law. It is also undisputed that the issues regarding Check 757 are governed by Washington law, specifically Chapter 62A RCW and the progeny caselaw. The Court's prior rulings, however, have limited some of the ancillary issues in this dispute. Specifically, the Court's November 28, 2023 Order (Dkt. 074) on competing motions for summary judgment held that (1) the Contract's limited warranty did not fail its essential purpose; (2) there was no meeting of the minds with respect to an accord and satisfaction of the final invoice and Check 757; and (3) that Glacier Guides did not anticipatorily breach the Contract when it issued a stop payment order on Check 757.[2]

### IV. FACTUAL AND LEGAL ISSUES TO BE DECIDED AT TRIAL

Whether PMI breached its Contract with Glacier Guides presents a mixed question of fact and law. The issue of whether Glacier Guides' stop payment order on Check 757 was justified, however, is predominantly a factual question. Here, Glacier Guides addresses each issue in turn.

---

[2] Despite the Court's November 2023 Order, Glacier Guides anticipates that PMI will nevertheless raise the argument of anticipatory breach at trial. Therefore, Glacier Guides respectfully requests that the Court address this issue and the applicability of its prior Order in the event of a pre-trial conference on Friday, June 27, 2025.

A.  **Glacier Guides is Entitled to Recover Against PMI for Breach of Contract**

Vessel repair contracts, like all maritime contracts, are construed under the general principals of contract law: "by their terms and consistent with the intent of the parties." *Norfolk Southern R. Co. v. James N. Kriby, Pty Ltd.*, 543 U.S. 14, 31 (2004). Clear and unambiguous words in a contract allow its meaning to be determined as a matter of law "in accordance with its plainly expressed intent." *CITGO Asphalt Refining Co. v. Frescati Shipping Co., Ltd.*, 589 U.S. 348, 355 (2020) (internal quotations omitted).

Construed as a whole, according to its plain language, the Contract here establishes clear and legally determinable duties, limitations, and procedures governing the Project. Specifically:

1) PMI's work was "limited to the work identified" in the pre-defined Project Scope. Terms and Conditions, Paragraph 1; *see also id.*, Paragraph 12 A.

2) The Project Scope could be increased or decreased by Glacier Guides. Such modifications, however, required specific approval and needed to "be presented in writing to PMI's management for pricing and scheduling" adjustments "prior to commencement of work." Haul-Out Agreement, Page 2; *see also* Terms and Conditions, Paragraph 4 (changes may be oral, but required written confirmation); AWP Agreement (Zach and Alisha Decker "will authorize all work performed, pay invoices as scheduled and agree to any additional work").

3) PMI warranted that its "work shall precisely conform to [the Project Scope] and any amendment, that the same shall be free from defects and deficiencies, and that its workmanship shall otherwise be of good commercial quality". Terms and Conditions, Paragraph 12 A.

4) Glacier Guides waived "any defect in workmanship or materials that was open and evident and/or could have been discovered during the course of work or at the time of redelivery". *Id.*, Paragraph 12 B (1).

Determining whether PMI breached these provisions, however, is a question of fact.[3] Glacier Guides will present evidence at trial that PMI breached the parties' Contract in many ways and deprived Glacier Guides of its benefits under the Contract.

1. <u>PMI Breached the Contract by Performing Work Without Proper Written Authorization, Pricing Updates, and Schedule Modifications.</u>

PMI failed to limit its work to the pre-defined Project Scope and failed to administer the change order provisions in accordance with its obligations under the Contract. These failures resulted in PMI performing unauthorized work outside of the Project Scope, an unconscionable final invoice, and unjustifiable Project delays.

While estimates are not exact, trial testimony from both plaintiff and defense witnesses will demonstrate that standard practices in the boat repair and refit industry are for actual costs not to exceed estimates by more than ten to fifteen percent (10-15%). Here, the proposed total cost of all work based upon the pre-defined Project Scope was approximately $277,348.00; however, PMI would eventually charge Glacier Guides $492,253.75 for the work. Excluding authorized change orders, approximately $185,000 worth of that work was performed with no written authorization or documented change order. Written change orders are of course necessary, and mandated by the Contract, so that both PMI and Glacier Guides understood how changes in the scope of work would affect the schedule and price of the Project.

Moreover, pursuant to the Contract, PMI issued bi-monthly invoices to Glacier Guides, which averaged around $17,000 each, and roughly tracked the expected

---

[3] *See Western Towboat Co. v. Vigor Marine, LLC*, 544 F.Supp.3d 1100, 1116 (W.D. Wash. 2021); *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364 (9th Cir. 1985).

and agreed upon Project budget. It was only at the time of re-delivery of the Vessel that PMI issued a whopping final bill of $251,580.76. Both fact and expert testimony will be presented at trial to explain how PMI's failure to implement reasonable, industry standard control measures like developing and updating feasible work schedules, subcontractor and supplier coordination, work sequencing and shipyard resource allocations, with appropriate levels of documentation, caused the Project to run dramatically over schedule and allowed costs to balloon wildly out of control, culminating in PMI's unconscionable final bill.[4] Evidence presented at trial will also show that PMI unreasonably prioritized lucrative Coast Guard repair jobs over its work on the Vessel. This contributed to the Project delays and PMI's defective work at issue here.

### 2. PMI Breached the Contract with its Defective Work.

A myriad of work done by PMI was unacceptably defective. Glacier Guides' expert witness Ron Riesner ("Mr. Riesner") – a prominent marine surveyor with more than 50 years' experience – authored an in-depth report on PMI's defective work. Mr. Riesner will testify and present evidence of the extensive list of substandard and defective work PMI performed. This includes certain work that is plainly faulty, such as components which failed leak testing, and a leaking fuel tank which pooled gasoline into the hull of the Vessel, but also includes many items, such as damaged paint and coating application, which fall unacceptably short of the Contract requirement that the work "shall be free from defects and deficiencies," as well as other applicable industry

---

[4] PMI's conduct in its performance also raises the ancillary question of whether it conformed with the implied duty of good faith and fair dealing, which may support a finding that PMI breached the Contract. *See e.g., Flores v. American Seafoods Co.*, 335 F.3d 904, 913 (9th Cir. 2003); Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.").

DEFENDANT GLACIER GUIDES, INC.'S TRIAL BRIEF
Case No. 1:22-cv-00006-APG
Page 10 of 13

standards for work on a luxury yacht of the ALASKAN GRANDEUR's type and purpose.

Mr. Riesner has calculated and will testify that correcting PMI's defective work would cost $211,560.00. While the Court's prior Order ruled that a provision of the Contract limiting recoverable damages to $100,000.00 is enforceable, Glacier Guides will still seek a factual finding from the Court that true value of the damage conforms to Mr. Riesner's opinion, and is limited only by the Contract. Such a finding will simplify the Contract interpretation question in the event of appeal, and abrogate the need to return to the Trial Court for further findings.

For its part, PMI may attempt to illicit rebuttal testimony as to a lesser applicable standard of care and lower industry standards. This testimony, however, should not be permitted as it would present an attempt to disclaim PMI's contractual warranties. Furthermore, as the Court held in its June 9, 2025 Order (Dkt. 138), PMI is precluded from eliciting surprise expert opinion testimony from its fact witnesses during trial. Allowing such lesser standard of care testimony to pollute the record would prejudice any further proceedings, such as appeals.

3. <u>PMI Breached the Contract by Depriving Glacier Guides of its Contractual Benefits.</u>

Throughout the course of litigation, PMI has argued that Glacier Guides "waived the warranty provision because the defects of which it complains were 'open and obvious.'" Dkt. 074, at 20. Glacier Guides anticipates that PMI will seek to further advance this argument at trial. The evidence, however, will show that the Project delays attributable to PMI deprived Glacier Guides of the reasonable opportunity to inspect the Vessel upon redelivery.

Indeed, the Contract required Glacier Guides to identify "open and evident" defects or those reasonably discoverable no later than the time of redelivery. Terms

DEFENDANT GLACIER GUIDES, INC.'S TRIAL BRIEF
Case No. 1:22-cv-00006-APG
Page 11 of 13

Case 1:22-cv-00006-APG   Document 141   Filed 06/09/25   Page 11 of 14

and Conditions, Paragraph 12 B (1). Because the Contract imposed the obligation of identifying such defects upon Glacier Guides, it follows, *a fortiori*, that it must have been afforded a reasonable opportunity to conduct such an inspection for defects. Glacier Guides, however, was deprived of this inspection opportunity because of the unreasonable Project delays attributable to PMI.

Simply put, PMI cannot seek refuge behind its waiver provisions when it delayed redelivery of the Vessel until the eleventh hour and knew that Glacier Guides had to set sail for Alaska the same day.

B. **The Stop Payment Order on Check 757 was Justified**

Under RCW 62A.3-515 (a), one entitled to enforce a dishonored check may recover its reasonable costs and attorneys' fees incurred in recovering the sums owed. Nevertheless, if the check "is dishonored by reason of a justifiable stop payment order" the party seeking to enforce the check cannot recover its costs and fees. *Id.* (emphasis added); *see also Toyota of Puyallup, Inc. v. Tracy*, 63 Wn.App. 346, 352-52 (1991); Dkt. 074, at 12. Here, Glacier Guides anticipates that PMI will argue that the stop payment order on Check 757 was unjustified and that it may recover costs and fees.

The threshold factual inquiry for the Court regarding the stop payment order is whether Glacier Guides owes the entire amount demanded by PMI to release the Vessel. If the Court determines that Glacier Guides does not owe PMI the entire amount of Check 757, the stop payment order was justified and RCW 62A.3-515 (a) does not apply. At bottom, stopping payment on Check 757 was justified because (1) PMI's work remained incomplete and defective at the time of redelivery; (2) PMI seeks payment for unauthorized, out of scope work; and (3) PMI's conduct deprived Glacier Guides of its benefits under the Contract. Furthermore, the $15,000.00 reduction on the final invoice does not factor into any accord and satisfaction argument that PMI may assert. In reality, this was a credit provided to Glacier Guides for materials that

were ordered and improperly charged to Glacier Guides but never used on the Project. Keeping with their trend of plainly inadequate documentation, however, PMI did not properly track these charges or credits in their work orders or Captain's reports. Simply put, RCW 62A.3-515 (a) does not apply here, and PMI is not entitled to recover its costs and fees incurred in seeking recovery of Check 757.

## V. CONCLUSION

All told, the evidence presented at trial will show that Glacier Guides is entitled to recover against PMI for breach of contract and that the stop payment order on Check 757 was justified. Finally, at the Court's request the parties will be available in Anchorage, Alaska on Friday, June 27, 2025, if an additional pre-trial conference is necessary, prior to the start of a four-day trial on Monday, June 30th.

RESPECTFULLY SUBMITTED this 9th day of June 2025.

SMITH, CURRIE OLES LLP

/s/ *Robin L. Kovis*
Thomas R. Krider, AK Bar No. 2201002
Drew F. Duggan (admitted *pro hac vice*)
Robin L. Kovis (admitted *pro hac vice*)
600 University Street, Suite 1800
Seattle, WA 98101
Phone: 206.623.3427
Fax: 206.682.6234
Email: trkrider@smithcurrie.com
dfduggan@smithcurrie.com
rkovis@smithcurrie.com

*Attorneys for Glacier Guides, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2025, a copy of the foregoing Defendant Glacier Guides, Inc.'s Motion in Limine was served electronically on:

Donald K. McLean, AKSB No. 0403006
Bauer Moynihan & Johnson LLP
2102 Fourth Ave, Suite 2400
Seattle, WA 98121
Telephone: (206) 443-3400
Fax: (206) 448-9076
Email: dkmclean@bmjlaw.com
Email: rsykes@bjmlaw.com

Attorney for Plaintiff

The undersigned hereby declares, under the penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge.

Executed at Seattle, Washington, this 9th day of June 2025.

*/s/ Catherine A. Trimbour*
Catherine A. Trimbour, Legal Assistant