# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| | |
|---|---|
| PLATYHPUS MARINE, INC., | Case No.: 1:22-cv-00006-APG |
| Plaintiff | **Findings of Fact and Conclusions of Law** |
| v. | |
| GLACIER GUIDES, INC., ALASKA LEGACY LLC, | |
| Defendants | |

I conducted a bench trial June 30 through July 3, 2025. Below are my findings and conclusions, as required under Federal Rule of Civil Procedure 52(a).

**I. FINDINGS OF FACT**

Platypus Marine, Inc. operates a shipyard in Port Angeles, Washington. One of its core businesses is the repair and servicing of commercial vessels.

Glacier Guides, Inc. is an Alaska-based provider of luxury yacht tours, guided hunting expeditions, charter fishing, and whale watching, among other services. Glacier uses the ALASKAN GRANDEUR (the Vessel) for its services. Defendant Alaska Legacy, LLC, an affiliate of Glacier, owns the Vessel.[1] Both Glacier and the Vessel are controlled by Alisha and Zach Decker. For convenience, I refer to the defendants collectively as Glacier.

---

[1] There is some confusion about this. Platypus alleges that defendant Alaska Legacy, LLC owns the Vessel. ECF No. 18 at 2. The defendants admit this in their answer to the second amended complaint and admit that Legacy entered into the subject contracts with Platypus. ECF No. 23 at 2-3. But the contracts name Zach and Alisha Decker as owners of the Vessel. Exhs. 2, 3. And in their proposed findings and conclusions, both parties contend the Vessel is owned by Alaska Grandeur, LLC. ECF Nos. 147 at 2, 149 at 3. But Alaska Grandeur, LLC is not a named defendant.

Platypus occasionally provided repair and renovation services for the Vessel since 2005. In September 2021, Platypus contacted Glacier asking whether the Vessel needed maintenance and repair services over the coming winter (the Project). Glacier responded yes and the parties began coordinating the logistical aspects of the Project.

In early November 2021, Glacier tendered a $5,000.00 refundable deposit to Platypus, and the parties prepared a preliminary scope of work for the Project. On December 2, 2021, the Vessel arrived in Port Angeles. The next day, Platypus pulled the Vessel from the water and moved it to Platypus's work facility. The parties entered into a contract which consisted of a Vessel Haul-out Agreement & Yard Policies (Exh. 2[2]) and Vessel Repair Terms and Conditions and Authorization for Work Performed (Exh. 3) (collectively, the Contract).

Shortly after the Vessel was pulled from the water, Zach Decker and Platypus representative Nick Burgett inspected it to determine the scope of work. On December 23, 2021, Burgett sent several Work Orders to Glacier. Glacier accepted and signed Customer Work Orders 1-6 and 10-12 but rejected Work Orders 7-9. Some of the work Glacier rejected was later rolled into Work Order 13, which Glacier approved.

During the Project, Platypus invoiced Glacier (through Zach and Alisha Decker) on a regular basis. Exh. 4. The invoices included color-coded "Captain's Reports" that identified the work being done and whether it was being charged on a fixed price, a bid, or a "time and materials" basis. Glacier reviewed the invoices and Captain's Reports as they were received. Prior to the final invoice, Glacier did not object to any work identified as "Time and Materials" on the Captain's Report, did not refuse to pay any of

---

[2] References to exhibits are to the numbers used during the trial.

the invoices, and did not request any clarification of work performed or terms listed in the invoices. Zach did, however, ask for and receive a discount on some of the labor rates.

Zach was on-site—and on the Vessel—several times during the Project, often for days at a time, working on various items on the Vessel. Glacier also had other employees (particularly Todd Boughner) performing work on the Vessel at times. During the Project, Zach asked for the plans to be modified and work to be performed or deleted, including expanding the flooring area and flybridge. *See*, *e.g.*, ECF No. 164 at 34-35. The parties discussed how those changes would impact the final cost, and many of them were made. Zach and Alisha worked directly with some of the vendors, designers, and subcontractors, including the flooring and stone suppliers. Zach and his crew performed some work on their own, with Platypus's consent. Several times during the Project, Zach and Platypus representatives walked the Vessel to inspect the work. Glacier pointed out items for Platypus to correct, which was done. Glacier did not raise any significant objections to the quality of Platypus's work.

Although the Project was supposed to be completed in mid-to-late February 2022, delays dragged it out through the end of March 2022. Causes for the delays included labor and supply-chain problems related to the COVID-19 pandemic and Glacier's changes to the Project's scope.

As the Project stretched into March, Glacier became concerned that the Vessel would not be re-delivered in time to outfit and sail it to Alaska to meet Glacier's charter deadlines. Platypus explained that if the Vessel was launched early, some work (particularly painting) would not be completed and properly cured, which would void Platypus's warranty of its work. Ultimately, the parties agreed to launch the boat by

3

April 4, 2022.  Glacier acknowledged that its crew would need to complete some of the repair tasks during the return trip to Alaska.

As the launch date approached, Zach, Alisha, and their crew came to Platypus's yard to inspect the Vessel and outfit and prepare it for the return trip to Alaska.  On March 31, Platypus issued a final invoice for $292,253.74.  Glacier was surprised by that amount.  On April 4, Platypus representatives Chris Feffer, Jud Linnabary, and Nick Burgett met with the Deckers to discuss the final bill.  The Deckers disputed a number of the charges.  Linnabary (who was Platypus's President at the time) did not want to discuss many of the details of the Deckers' complaints.  The meeting lasted about 45 minutes.  Shortly after it ended, Platypus deducted $15,000 from the final invoice as a compromise.  The deduction was based on Platypus's best estimate of materials that were not used and anticipated corrected prices from its subcontractors.[3]  After applying the deduction and Glacier's earlier $5,000 deposit, the new invoice amount was $272,253.74.  The final Project cost was $492,253.75. Exh. 11 at 10.  Burgett texted Zach that he "should see our updated statement with the discount applied any minute."

After viewing the updated invoice, Zach responded to Burgett that "[w]e are on r way over[;] that won't work."  Burgett replied that he would be at lunch until 12:30.  Zach then briefly spoke on the phone with Burgett, who stated Platypus would offer no further discount.  Shortly after the phone call, Zach texted Burgett that "I guess you can come pick up the check[.]"

"The check" ended up being two checks, both dated April 4, 2022.  Check No.

---

[3]  It was common for Platypus to issue a revised final invoice days or weeks after completing work on a boat, after its subcontractors had submitted their final bills.  That did not happen here because of this dispute.

4

756 was for $104,242.56 and Check No. 757 was for $168,011.18. Exh. 9. In the memo field of each check, Alisha wrote: "Platypus Invoice AGR003-16," which matches Platypus's invoice number. *Id*. The amount of Check No. 757 was based on Glacier's belief that Platypus had overcharged by that amount.[4] The Deckers wrote that check with the intent to stop payment on it as soon as the Vessel left Platypus's yard. They felt they had no other choice: they disputed the final bill but needed to have the Vessel launched immediately to avoid canceling charters, and Platypus refused to negotiate further. The Deckers believed that canceling the check would force Platypus back into negotiations. At the time they tendered the checks, the Deckers did not say they were paying under protest.

When Burgett collected the checks, he noticed only one and called Zach to ask why they were short-paying Platypus. Zach confirmed they had written two checks to cover the entire balance. Burgett then discovered the second check. Zach did not say he would soon cancel Check No. 757.

When Platypus attempted to cash the checks, it discovered that Glacier had stopped payment on Check No. 757. By then, the Vessel was on its way back to Alaska. The Vessel's AIS tracker had been turned off, which suggested to Platypus that Glacier was trying to avoid the Coast Guard seizing and returning the Vessel to Port Angeles to hold as collateral for the payment.

On April 11, 2022, Platypus's lawyer notified Glacier that Check No. 757 had not been accepted for payment by the bank. Exh. 27. Platypus advised that if Glacier did not

---

[4] Glacier did not pay for anything not covered by a written change order unless the Deckers had specifically approved it separately. Exh. 11 at pp. 9-11.

5

pay the amount of that check within 15 days, it could be liable for collection costs, attorneys' fees, interest at 12%, and a $300 penalty. *Id.* Despite telling Glacier it had 15 days to pay, on the next day (April 12, 2022) Platypus filed this lawsuit, asserting a cause of action for enforcement of a maritime lien against the Vessel. ECF No. 1. The complaint requested that the Vessel be arrested and that judgment be entered against "the defendants"[5] for the amount of Check No. 757 plus attorney's fees, costs, and 12% interest.[6] Platypus later filed a second amended complaint adding Glacier as defendants and asserting claims for (1) enforcement of the lien against the Vessel; (2) breach of contract; and (3) enforcement of Check No. 757 under the relevant Washington statute. ECF No. 18. Platypus later dismissed its maritime lien claim and request for arrest of the Vessel (ECF No. 115), so its remaining claims are for (1) breach of contract, because Glacier failed to fully pay the final invoice, and (2) to enforce Check No. 757. Platypus demands the principal sum of $168,011.18 plus interest, statutory costs, and attorneys' fees.

Glacier asserts a single counterclaim for breach of the contract/warranty for Platypus's alleged unauthorized and deficient work. ECF No. 23 at 6. Glacier contends Platypus delivered the Vessel with defects and deficient work; overcharged for labor and materials; and provided labor and materials without approval. *Id.* at 5-6. Glacier's damage amount has varied between $396,560 (ECF No. 149 at 2) and $245,467.50 (ECF No. 169 at 12 n.49).

---

[5] The Vessel was the only defendant at that time.

[6] Filing that complaint less than 15 days after giving Glacier notice may void Platypus's current demand for attorneys' fees, costs, and 12% interest under Revised Code of Washington (RCW) § 62A.3-515. *See* RCW § 62A.3-525. I do not address this issue at this time.

6

## II. CONCLUSIONS OF LAW

The court has jurisdiction over the parties and the subject matter of the case. Venue is proper as the defendants reside within the State and federal District of Alaska. 28 U.S.C. § 1391(b)(1). Neither party has objected to jurisdiction or venue.

### **Glacier is liable for dishonoring Check No. 757.**

Platypus's primary claim is the enforcement of Glacier's dishonored check. Judge Holland previously found, and neither party disputed, that RCW § 62A.3-515 applies to that check. *See* ECF No. 74 at 11. I agree.

Under RCW Chapter 62A.3, if a check is dishonored, the payee may collect the value of the check. However, "a stop payment order is justifiable if at the time it is issued the underlying contract does not obligate the drawer to pay the entire face amount of the check." *Toyota of Puyallup, Inc. v. Tracy*, 818 P.2d 1122, 1126 (Wash. App. 1991). Glacier argues that Platypus's defective work and overcharges justified its cancellation of Check No. 757. Platypus counters that Glacier cannot assert that defense because the parties entered into an "accord and satisfaction" when Glacier issued the two checks to pay the reduced final invoice. "When an accord is fully performed, . . . all defenses and arguments based on the underlying contract are extinguished." *Paopao v. State, Dep't of Soc. & Health Servs.*, 185 P.3d 640, 643–44 (Wash. App. 2008).

"Accord and satisfaction requires the parties have a bona fide dispute, an agreement to settle that dispute, and performance of the agreement." *Id*. at 643. "An accord and satisfaction is a new contract—a contract complete in itself." *Id*. (citing *Evans v. Columbia Int'l Corp.*, 478 P.2d 785, 786 (Wash. App. 1970)). Its

enforceability does not depend on the antecedent agreement. *Id*. (citing *Nw. Motors, Ltd. v. James*, 822 P.2d 280 (Wash. 1992); *Perez v. Pappas*, 659 P.2d 475 (Wash. 1983)).

Here, the parties had a bona fide dispute over the amount of the final invoice. Platypus offered to settle that dispute by discounting its invoice by $15,000. Glacier accepted this offer by delivering two checks for the reduced amount. The fact that Glacier secretly intended to cancel Check No. 757 is immaterial. *See Multicare Med. Ctr. v. Dep't of Soc. & Health Servs.*, 790 P.2d 124, 132-33 (Wash. 1990) (holding "the unexpressed subjective intention of the parties is irrelevant; the mutual assent of the parties must be gleaned from their outward manifestations"); 1 Richard A. Lord, *Williston on Contracts* § 3:5 (4th ed. 2010) ("[R]eal but unexpressed intention is irrelevant.").

This case is directly on point with *Northwest Motors v. James*. In that case, James' car was repaired by Northwest Motors. The repairs were delayed and James believed he was overcharged. Angry about the delays and the amount of the bill, James issued a check on which he intended to stop payment in order to release the car. 822 P.2d 280, 297 (Wash. 1992). The trial court found that James did not owe the full amount charged because the auto shop did not comply with the relevant statute that requires the owner to sign off on an estimate before work is performed. The trial court thus found there was a justifiable basis to stop payment on the check. *Id*. at 298.

Both the Washington Court of Appeals and the Supreme Court of Washington disagreed and reversed the trial court. The Supreme Court of Washington ruled that when the repair shop compromised the original amount of the invoice and James paid the invoice, the parties reached an accord and satisfaction and James could not dispute

that the compromised amount was owed. *Id*. at 303-04.  Thus, Northwest Motors was able to recover the entire amount under RCW § 62A.3-515. *Id*. at 305.[7]

In the present case, like in *Northwest Motors*, the parties disputed the amount Glacier owed on the final invoice.  Platypus reduced the amount owed and Glacier paid the reduced amount with a check on which it intended to stop payment.  Glacier's secret intent to cancel the check is irrelevant. *Multicare Med. Ctr.*, 790 P.2d at 132-33.  Accordingly, Check No. 757 is enforceable under the principle of accord and satisfaction.  The new accord (or agreement) is payment of the final amount demanded by Platypus ($272,253.74), which Glacier accepted by tendering two checks.  Glacier is obligated to pay the full amount of the dishonored check, $168,011.18 in satisfaction of that accord.

Platypus also seeks interest, statutory costs, and attorney fees under RCW § 62A.3-515. ECF No. 18 at 6.  But as mentioned above in footnote 6, Platypus may have waived its right to recover those statutory amounts by filing this lawsuit prematurely.  That issue will be resolved after additional briefing.  Presently, Platypus is entitled to an award of $168,011.18 on its claim for enforcement of Check No. 757 under RCW § 62A.3-515.

Because the parties reached an accord and satisfaction, Platypus's breach of contract claim is moot.  "When an accord is fully performed, the previously existing claim is discharged and all defenses and arguments based on the underlying contract are extinguished." *Paopao*, 185 P.3d at 643-44 (simplified).  But that does not automatically

---

[7] *See also Evans v. Columbia Int'l Corp.*, 478 P.2d 785, 786 (Wash. App. 1970) (An accord is "implied if, in fact, the amount due is disputed, the debtor tenders his check in full payment of the debt, and the creditor cashes the check.").

9

preclude Glacier's counterclaim against Platypus. "A strong presumption attaches that the parties have considered and settled every existing difference. To overcome this strong presumption requires testimony so clear and convincing that the court can free the transaction from all doubt as to the intent of the parties." *Id.* at 644 (simplified). Nick Burgett testified that, due to the need to launch the Vessel quickly, the parties did not do a complete walkthrough at the time of delivery. ECF No. 165 at 98-99. Platypus repaired what it could at that time but did not fix everything. *Id.* at 98-100. Chris Feffer testified Platypus agreed to repair some of its deficient work at a later date. *See, e.g.*, ECF No. 164 at 140-41, 145, 156-57. Platypus gave Glacier some repair materials for its crew to use on the trip back and offered to ship materials to Alaska to repair some of the other work. *See, e.g., id.* at 140-41, 155. Feffer testified that Platypus intended to repair its defective work and would have honored its warranty if Glacier had paid the final invoice in full (*i.e.*, had Glacier not canceled Check No. 757). *Id.* at 242-43. That is clear and convincing testimony that Platypus intended to honor its warranty and repair deficient work had payment been made. *Paopao*, 185 P.3d at 644. Because full payment is due under the accord and satisfaction, Platypus must honor its warranty and repair its deficient work. Thus, Glacier's counterclaim remains viable.

**<u>Platypus is liable for the cost to cure its deficient work.</u>**

Glacier claims Platypus breached the Contract and its warranty by charging for work that was not approved in writing and failing to cure its deficient work. Glacier's claim related to Platypus failing to obtain written work orders is barred because of the parties' accord and satisfaction. *Paopao*, 185 P.3d at 643-44 ("When an accord is fully performed, the previously existing claim is discharged and all defenses and arguments

10

based on the underlying contract are extinguished."). But as set forth above, Glacier's claim for breach of warranty survives.

Platypus warranted that its work "shall be free from defects and deficiencies, and that its workmanship shall otherwise be of good commercial quality for a period of one (one) [sic] year" after redelivery of the Vessel. Exh. 3 at ¶12(A). Upon redelivery, Glacier was to inspect the Vessel to determine if Platypus's work was "non-conforming, defective, or deficient." *Id*. at ¶11. "All non-conformities, defects, and deficiencies must be discovered and notified in writing to Platypus within the warranty period," i.e., within one year of redelivery. *Id*. at ¶12(A)(1). Notwithstanding that one-year discovery provision, Glacier "specifically waive[d] . . . any defect in workmanship or materials that was open and evident and/or could have been discovered during the course of work or at the time of redelivery[.]" *Id*. at ¶12(B). Thus, Glacier had to discover and notify Platypus of deficient work at the time of redelivery. Platypus then would have a reasonable opportunity to inspect, confirm, and cure the defects. *Id*. at ¶12(A)(2, 3).

However, if Platypus hindered Glacier's ability to fully inspect the Vessel upon redelivery or did not have time to cure its deficient work before launch, then Platypus cannot hide behind this limitation. That would improperly allow Platypus to use the limited warranty as both a sword and a shield.

Because Platypus did not timely finish its work, there was insufficient time for Glacier to fully inspect the Vessel and for Platypus to cure the identified defects. During the final inspection, parts of the Vessel were covered in tarp and Platypus's and Glacier's respective crews were still cleaning the Vessel. Had Platypus timely completed its work as originally planned, there would have been sufficient time for

11

inspection and for Platypus to cure its deficient work at its own cost. While some of the delay is attributable to Glacier for changing the scope of the Project, most of the delay belongs to Platypus. It would be unjust to allow Platypus to avoid its responsibility to correct its work because it delayed redelivery of the Vessel.

Zach, Jud Linnabary, and Nick Burgett inspected the Vessel at redelivery and identified work to be corrected, including addressing "paint blotches" and paint or adhesive on cushions. ECF No. 165 at 98-100; ECF No. 164 at 145. Platypus fixed what it could at that time but some problems were left open to address at a later date. *See*, *e.g.*, ECF No. 164 at 156-57. Platypus presented evidence at trial about some, but not all, of the specific "paint blotches" and other defects that were identified and remained uncured. On the other hand, Glacier's expert Ron Reisner identified several painting defects and other deficiencies, which were included in his "Report of Deficiencies in Platypus Marine Work." Exh. TT. The deficiencies were mostly cosmetic and did not prevent Glacier from operating the Vessel and conducting its charter business. Further, Glacier has not corrected most of the defects since redelivery of the Vessel over three years ago. Nevertheless, because Platypus warranted to perform work of "good commercial quality" on a luxury yacht, it is responsible for correcting even cosmetic defects.

The biggest repair expense is painting (items 42, 46, 48, 53, I, J, K, L, M, and O). Exh. TT at 49-50. Glacier's expert Reisner testified that, due to the nature of the Awlgrip paint used in some areas, it cannot be spot repaired because doing so would create "visual disconformity on the painted surface." Exh. TT at 49. Platypus did not rebut that. Given that Platypus admits it needed to fix some of its paint work but has not identified the

specific areas (and whether those could be spot repaired), the entire amount for these items is chargeable to Platypus.

Some of the deficient work on Reisner's list was not performed by Platypus. Some of the identified items appear to have been caused after the Vessel left Platypus's yard. Some of the repairs were offered by Platypus but declined by Glacier. All of those items are excluded from the warranty. Based on the trial testimony and evidence, Platypus is liable for the repairs listed in Reisner's report as item numbers 3, 8A, 8B, 20, 27, 32, 42, 46, 48, 53, L, J, K, L, M, 56, 57, 58, 68, B, S, U, V, and AA. Exh. TT at 43-55. The total cost for those repairs is $105,440.[8]

However, the Contract limits Platypus's liability to $100,000. Exh. 3 at ¶12(A)(7, 9). Such limitations on liability are valid. *Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1014 (9th Cir. 1999) ("Exculpatory clauses are enforceable even when they completely absolve parties from liability for negligence."); *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1488 (9th Cir. 1983) ("It is well settled that in admiralty law, the parties to a repair contract may validly stipulate that the shipowner is to assume all liability for *all* damage occasioned by the negligence of the shipyard." (emphasis in original)).[9] Although Glacier contends this limitation cannot be enforced because Platypus acted in bad faith, I find no evidence to support a finding of intentional misconduct, gross negligence, or bad faith by Platypus. Thus, Platypus' liability is

---

[8] To the extent Platypus could be deemed liable for additional repairs, those would be excluded by the cap on liability discussed below.

[9] Platypus's limited warranty has been found enforceable by at least one other court. *See S/Y Paliador, LLC v. Platypus Marine, Inc.*, 750 F. Supp. 3d 1187, 1201-3 (W.D. Wash. 2024). In the present case, Judge Holland likewise found the limitation clauses in the parties' Contract to be valid and enforceable. *See* ECF No. 74, pp. 20-22.

13

capped at $100,000. Glacier is entitled to an award against Platypus for $100,000 for its counterclaim of breach warranty.

### The parties are to confer about the remaining issues.

I have awarded Platypus $168,011.18 on its claim to enforce Check No. 757 and Glacier $100,000 on its claim of breach of warranty. Several issues remain, including:

> (1) whether the 12% statutory interest under RCW § 62A.3-515 runs on the total amount of Check No. 757 or on Platypus' net judgment (i.e., $68,011.18),
>
> (2) whether and what amount of prejudgment interest is allowed on Glacier's $100,000 counterclaim award,
>
> (3) whether Platypus is entitled to recover its attorney fees under RCW § 62A.3-515 and, if so, in what amount, and
>
> (4) who are the proper defendants for and against whom judgment will be entered (see footnote 1 above).

The parties are to confer regarding these and any other issues that remain. Agreements can be reduced to a stipulation. If any issues cannot be agreed upon, the parties will file a joint status report identifying the disagreements and proposing a briefing schedule.

## III. CONCLUSION

I THEREFORE ORDER that Platypus is entitled to an award of $168,011.18 on its claim for enforcement of Check No. 757 under RCW § 62A.3-515, and the defendants[10] are entitled to an award of $100,000 against Platypus on their breach of warranty counterclaim.

---

[10] Again, it is unclear who are the proper defendants that are entitled to this award. The parties will either stipulate to this issue or address it in their supplemental briefs.

I FURTHER ORDER that Platypus's remaining claim for breach of contract is dismissed as moot.

I FURTHER ORDER the parties to confer about the issues identified above. Any agreements will be reduced to a stipulation. If any issues cannot be agreed upon, the parties will file a joint status report identifying the disagreements and proposing a briefing schedule. The stipulations and joint status report are due by December 5, 2025.

DATED this 4th day of November, 2025.

ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE